**THE GIESZL FIRM**
3200 N. Central Avenue
Suite 1500
Phoenix, AZ 85012
T-602-277-0772  F-480-287-9589
*Holly@gieszlfirm.com*

Holly R. Gieszl, SBN 013845
Counsel for PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

No.: 2:16-cv-01866-PGR-BSB

Thomas O. Bastian,

                Plaintiff,

    v.

Charles Ryan, et al.,

                Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CONTROVERTING STATEMENT OF FACTS**

Plaintiff Thomas O. Bastian ("Bastian"), by and through undersigned counsel, and pursuant to Pursuant to Rule 56(e)(2), Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 56.1(b), hereby files his response to defendant Taylor's Statement of Facts and his Separate Statement of Facts ("SOF") in opposition to Defendant's Motion for Summary Judgment.

Respectfully submitted on March 8, 2018.

1

# TABLE OF CONTENTS

**I.    PLAINTIFF'S  LOCAL RULE 56.1(b)(1) RESPONSE, CONTROVERTING STATEMENT OF FACTS, AND OBJECTIONS TO DEFENDANT'S SEPARATE STATEMENT OF FACTS OFFERED IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT………………………………………………………….3**

**II.    PLAINTIF'S LOCAL RULE 56.1(b)(2) SEPARATE STATEMENT OF ADDITIONAL FACTS THAT EITHER ESTABLISH A GENUINE ISSUE OF MATERIAL FACT OR OTHEWISE PRECLUDE JUDGMENTIN FAVOR OF DEFENDANT'S  AND THAT ARE CITED WITHIN HIS RESPONSIVE MEMORANDUM SUBMITTED IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARYJUDGMENT………………….................................................................26**

**I.    PLAINTIFF'S  RESPONSE, CONTROVERTING STATEMENT OF FACTS, AND OBJECTIONS TO DEFENDANT'S SEPARATE STATEMENT OF FACTS OFFERED IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

| PAR. IN DEFENDANT'S STATEMENT OF FACTS | PLAINTIFF'S  RESPONSE, RULE 56(C)(2) OBJECTIONS, AND CONTROVERTING STATEMENT OF FACT WHERE APPROPRIATE |
|---|---|
| | |
| 1. | **Admit** |
| 2. | **Admit** |
| 3. | **Disputed**<br><br>**Objections.** Defendant excerpts portions of the Complaint taken out of context. |
| 4 | **Admit** |
| 5 | **Disputed**<br><br>**Controverting Statement**.  Defendant emphasizes the finding of "**normal left shoulder**" on X-Ray on 10/9/14 (emphasis added to record by Defendant) to<br>mischaracterizes the evidence and argue that Mr. Bastian did not have a shoulder problem.   There is no evidence from Defendant, an expert, or in the record to suggest that a shoulder x-ray reveals injuries which can be detected only through other imaging modalities.   Indeed, the MRI previously performed on 6/7/10 (SSOF    5) revealed three distinct abnormalities: a ganglian cyst and bursitis at the rotator interval; a partial tear of the distal subcapularis with underlying tendonitis; and possible impingement requiring "clinical correlation" impingement.   This was not a "normal left shoulder." |
| 6 | **Admit** |
| 7 | **Admit** |
| 8 | **Admit** |
| 9 | **Admit** |
| 10 | **Admit** |
| 11 | **Admit** |
| 12 | **Admit** |
| 13 | **Admit** |
| 14 | **Disputed as to "normal left shoulder" on October 9,2014.**<br><br>**Controverting Statement**. The undisputed medical records taken together demonstrate that from 7/17/10 forward, Mr. Bastian did not have a |

"normal" left shoulder.  In this period, Mr. Bastian consistently complained about shoulder pain (DSSOF 10, 11-12, 14-16, 19, 20, 22 ). Providers at Eyman continued prescribing pain medications (DSSOF 6, 7, 9, 12 -15), a SNO for side restraints (DSSOF 8), and regularly saw Mr. Bastian for shoulder pain complaints. (DSSOF  5, 12, 17-18, 23, 25, 27).

Plaintiff was diagnosed only six days later, on October 15, 2014, as having degenerative joint disease.

Mr. Bastian was  seen by outside consultant, Dr. Nilsen for shoulder pain on December 29, 2014 and the diagnosis was made of "possible SLAP tear."  (# 23).

Mr. Bastian was transferred to the MCSO in November of 2016 and had surgery on his left shoulder  for a SLAP tear. (PSSOF

| 15 | **Admit** |
| 16 | **Admit** |
| 17 | **Admit** |
| 18 | **Admit** |
| 19 | **Admit** |
| 20 | **Admit** |
| 21 | **Admit** |
| 22 | **Admit** |
| 23 | **Disputed**<br><br>*Objection.*  There was no "old MRI." Accordingly, this statement lacks foundation. |
| 24 | **Admit**<br><br>**Clarification**:  Taylor never obtained Mr. Bastian's MRI results from 2010. |
| 25 | **Admit** |
| 26 | **Admit** |
| 27 | **Admit** |
| 28 | **Admit** |
| 29 | **Disputed**<br><br>**Objection.**  Taylor seemingly suggests that something was amiss by Mr. Bastian's request "**to be seen by Taylor.**" (Emphasis in original.)  In fact, Taylor saw Mr. Bastian, the day **upon his arrival at Lewis** (DSSOF # 28) |

4

| | |
|---|---|
| | for his initial intake assessment, at which time Taylor told Bastian that she needed his old MRI record to check on an orthopedic consultation. |
| 30 | **Admit** |
| 31 | **Admit** |
| 32 | **Admit** |
| 33 | **Disputed.**<br><br>**Controverting Statement..** The findings of this MRI are consistent with the findings from the MRI on 6/17/2010. |
| 34 | **Admit** |
| 35 | **Admit** |
| 36 | **Admit** |
| 37 | **Admit**<br><br>**Clarification.** Prior to the time Taylor stopped seeing Mr. Bastian, she never obtained and forward to Dr. Toth the MRI report from April 17, 2015.  She also never rescheduled an appointment for Mr. Bastian to be seen again by Dr. Toth for a complete consult with the MRI images and report. |
| 38 | **Admit** |
| 39 | **Admit** |
| 40 | **Admit** |
| 41 | **Admit** |
| 42 | **Admit** |
| 43 | **Admit** |
| 44 | **Admit** |
| 45 | **Admit** |
| 46 | **Admit**<br><br>**Clarification.**  Plaintiff was seen on the nurse's line, not by Taylor or another Provider. |
| 47 | **Admit** |
| 48 | **Admit** |
| 49 | **Admit** |
| 50 | **Admit** |
| 51 | **Admit** |
| 52 | **Admit** |
| 53 | **Admit** |
| 54 | **Disputed.** |

|  |  |
|---|---|
|  | Mr. Bastian denies that the conversation as reported by COIII Herbert ever took place. [Bastian DEC at ; Bastian DEP at   ]<br><br>Mr. Bastian denies that he was issued a "disciplinary for possession of a USB cable and 2 flash cards in his cell on 7-10-15." [ Bastian DEC at   ; Bastian DEP at   ] |
| 55 | **Admit**<br><br>**Clarification**.  Taylor did not see or examine Mr.  Bastian on November 19, 2015, but  did decline to renew the SNO for front restraints and did not provide any documentation in the medical record as to the clinical reason that the HNR request was denied.<br><br>Paragraph 55  contradicts  Taylor's assertions in her Declaration (# 5 and # 6) that she had no involvement in the HNR process and would not have known if Mr. Bastian submitted an HNR about his shoulder injury after April 30, of 2015.  Here. Taylor denies renewal of his SNO as requested in his HNR submitted in November of 2015. |
| 56 | **Admit** |
| 57 | **Admit** |
| 58 | **Admit** |
| 59 | **Admit**<br><br>**Clarification.**  This e-mail established that Taylor knew as of January 28, 2016 that her supervisors were unaware that Taylor was not seeing Bastian and, moreover, that no other Provider was seeing him.  Taylor was specifically told "let me know and I can arrange something."  Taylor did nothing. |
| 60 | **Admit** |
| 61 | **Admit** |
| 62 | **Admit**<br><br>**Clarification.**  Carillo sent an e-mail to Taylor in an attempt to obtain a "verbal response" regarding Mr. Bastian's Informal Complaint Resolution ("ICR") , but  Taylor did not provide one.  She claimed she "was not allowed to see this inmate [due to] a conflict" and even admits that she attached ICR.  [Taylor DEC. at 18 ] |
| 63 | **Admit** |
| 64 | **Admit** |

| | |
|---|---|
| | **Clarification.**  Taylor prescribed medication for Mr.  Bastian despite not seeing him, examining him or --- purportedly --- even knowing his complaints, needs, or requests via the HNR process. |
| 65 | **Admit** |
| 66 | **Admit** |
| 67 | **Admit** |
| 68 | **Admit** |
| 69 | **Admit** |
| 70 | **Admit** |
| 71 | **Admit** |
| 72 | **Objection.**  Irrelevant.  There is no evidence that Mr.  Bastian was denied care due to being uncooperative. |
| 73 | **Admit** |
| 74 | **Admit** |
| 75 | **Admit** |
| 76 | **Admit** |
| 77 | **Admit** |
| 78 | **Admit** |
| 79 | **Admit** |
| 80 | **Admit** |
| 81 | **Admit** |
| 82 | **Admit** |
| 83 | **Objection**. Relevance; Does not relate to Defendant Taylor. |
| 84 | **Admit**<br><br>**Objection**: Relevance; Does nto relate to Defendant Taylor. |
| 85 | **Admit** |
| 86 | **Admit** |
| 87 | **Admit** |
| 88 | **Admit** |
| 89 | **Dispute**<br><br>**Controverting Statement.** The report from July of 2015 does not reveal a "normal left shoulder" and showed, instead, that |
| 90 | **Admit.** |
| 91 | **Admit.** |

| | |
|---|---|
| | **Clarification.**  Taylor was still receiving lab reports on Mr. Bastian, all the while claiming that everyone knew and agreed that she that she was not his Provider.<br><br>While Taylor claims that she noted "care needs to be directed to SMD [Dr. Barnett]", there is no record evidence as to where the "note" was directed. |
| 92 | **Admit.** |
| 93 | **Disputed in part.**<br><br>**Controverting Statements.**<br><br>There is no record evidence to support the claim that the offsite urology consult was "inadvertently re-requested."<br><br>This entry demonstrates that HFA Thomas was unaware that Taylor could not see Mr. Bastian. |
| 94 | **Disputed.**<br><br>**Controverted Statement.**  Plaintiff was not scheduled on Ende's line. |
| 95 | **Admit.** |
| 96 | **Admit as to Plaintiff's HNR complaining of kidney pain and burning upon urination.**<br><br>**Disputed as to Urine Sample and Thomas E-mail.**<br><br>**Controverting Statements**.<br><br>While not able to see Mr. Bastian, Taylor decided to involve herself in Mr. Bastian's urine testing and accuse him of submitting a sample of something other than urine.  There is no record evidence other than Taylor's accusation that the sample was not urine.<br><br>Dr. Barnett denied that she advised Taylor that Dr. Barnett had notified the FHA and Warden |
| 97 | **Admit** |
| 98 | **Admit** |
| 99 | **Admit** |
| 100 | **Admit** |
| 101 | **Disputed**<br><br>**Controverting Fact.** |

|  | The Correct date is July 19, 2016. |
|---|---|
| 102 | **Admit** |
| 103 | **Admit** |
| 104 | **Admit** |
| 105 | **Admit** |
| 106 | **Admit** |
| 107 | **Admit** |
| 108 | **Admit** |
| 109 | **Admit** |
| 110 | **Admit** |
| 111 | **Admit**<br><br>**Clarification.**<br><br>The requested consult was approved on September 1, 2016. |
| 112 | **Admit** |
| 113 | **Admit** |
| 114 | **Admit** |
| 115 | **Disputed.**<br><br>**Controverted Statement.**   Mr. Bastian denies that he told Taylor that she "was the only one who ever helped him."  [Bastian Dec at <span style="background-color: yellow">___</span>]. No other record evidence supports Taylor's assertion. |
| 116 | **Admit in part.**<br><br>**Clarification.**  Deputy Director Hood did not make a determination as to whether Taylor displayed deliberate indifference to Mr. Bastian's medical needs**.** |
| 117 | Admit |
| 118 | Admit<br>**Clarification.**  Deputy Director Hood's Grievance Appeal Response provided Mr. Bastian the relief he had requested in the form of consults for urology, orthopedics, and physical therapy. |
| 119 | **Admit** |
| 120 | **Admit** |
| 121 | **Admit**<br><br>**Clarification**.  This is after the time period at issue in Mr. Bastian's Complaint. |

| | |
|---|---|
| 122 | **Admit**<br><br>**Clarification.**  This is after the time period at issue in Mr. Bastian's Complaint.<br><br>This is after the time period at issue in Mr. Bastian's Complaint. |
| 123 | **Disputed.**  Plaintiff denies stating that his injuries started two years ago after an altercation.<br><br>**Clarification.**  This is after the time period at issue in Mr. Bastian's Complaint.<br>This is after the time period at issue in Mr. Bastian's Complaint. |
| 124 | Admit<br>**Clarification.**  This is after the time period at issue in Mr. Bastian's Complaint.<br>This is after the time period at issue in Mr. Bastian's Complaint. This is after Dr. Barret was informed by Richard Pratt to |
| 125 | **Admit.**<br><br>**Clarification.**  This is after the time period at issue in Mr. Bastian's Complaint.<br>This is after the time period at issue in Mr. Bastian's Complaint. |
| 126-1 | **Admit**<br><br>**Clarification.**  The date is outside the timeframe of Mr. Bastian's Complaint. |
| 127 | **Admit**<br><br>**Clarification.**  The date is outside the timeframe of Mr. Bastian's Complaint. |
| 128 | **Admit**<br><br>**Clarification.**  The date is outside the timeframe of Mr. Bastian's Complaint**.** |
| 129 | **Admit** |

| | |
|---|---|
| | **Clarification.**  The date is outside the timeframe of Mr. Bastian's Complaint**.** |
| 130 | **Admit** <br><br> **Clarification.**  The date is outside the timeframe of Mr. Bastian's Complaint. |
| 131 | **Admit** <br><br> **Clarification.**  The date is outside the timeframe of Mr. Bastian's Complaint.  Nonetheless, this visit confirms that Dr. Toth suspected a SLAP tear in October of 2016. |
| 132 | **Admit** |
| 133 | **Admit** |
| 134 | **Admit** |
| 135 | **Admit** |
| 136 | **Admit** |
| 137 | **Admit** |
| 138 | **Admit**  . |
| 139 | **Admit** |
| 140 | **Disputed.** <br><br> **Objection:** Relevance -  The statement involves a Correctional Health Service (CHS) employee not Taylor or even Corizon as well as time frames past those at issue in Mr. Bastian's Complaint. <br><br> **Controverting Fact.** <br><br> Mr. Bastian denies the attributed statement. |
| 141 | **Objection.** <br><br> Relevance -  The statement involves a Correctional Health Service (CHS) employee not Taylor or even Corizon as well as time frames past those at issue in Mr. Bastian's Complaint |
| 142 | **Admit** |
| 143 | **Admit** |
| 144 | **Admit** |
| 145 | **Admit** |
| 146 | Admit |
| 147 | Admit |

| 148 | Admit |
|---|---|
| 149 | Admit |
| 150 | Admit |
| 151 | Admit |
| 152 | Admit |
| 153 | Admit |
| 154 | Admit |
| 155 | Admit |
| 156 | Admit |
| 157 | **Objection.**  There is no expert testimony in this case to establish the "applicable standards of care."  Nor is evidence of the standard of care required in a____ 1983 action. |
| 158 | Admit |
| 159 | **Disputed.**<br><br>**Controverting Statement**. Mr. Bastian explains in his Declaration that every time he saw Taylor, she reviewed any HNRs that "triggered his request to be seen" and he personally saw her review the HNRs on the computer in the electronic medical record.  [Bastiam DEC at   ]. |

| 161 & 162 | **Disputed.**<br><br>**Controverting Facts.**<br><br>Taylor's response in # 162 contradicts her assertion in # 8 of Taylor'that she was not responsible for "reviewing, and/or responding to Inmate letters in the *ordinary* course and scope of [her] employment."(emphasis added).<br><br>Taylor acknowledges in # 171 that she **did** assist COIII Carillo in investigating and/or responding to Inmate Informal Complaints Resolutions that pertained to the specific medical care and treatment of inmate patients."<br><br>Taylor acknowledges in # 172 that was specifically asked by COIII Carillo via e-mail to review Mr. Bastian's Inmate Letter and provide a "verbal response" and she declined to do so. Taylor did not because it was not her job, but because it was from Mr. Bastian with whom she claimed to "have a conflict." |
| 163 & 164 | **Disputed.**<br><br>There has never been a "Deputy Warden" Moody at Lewis Prison or Rast Unit at Lewis Prison.  Chris Moody was the Warden of Lewis Prison.     Mooney was Deputy Warden of Rast Unit at Lewis Prison. |

| | |
|---|---|
| 165 | **Disputed.**<br><br>There has never been a "Deputy Warden" Moody at Lewis Prison or Rast Unit at Lewis Prison.  Chris Moody was the Warden of Lewis Prison.     Mooney was Deputy Warden of Rast Unit at Lewis Prison. |
| 166 | **Admit.** |
| 167 | **Admit.** |
| 168 | **Objection**.  This event is outside the timeframe of Plaintiff's Complaint and allegations against Taylor.<br><br>The x-rays on October 9, 2014, did not reveal a "normal Left shoulder. |
| 169 | **Objection.** Relevance --- Mr. Bastian's complaint is that Taylor failed to see him for approximately seven months or to arrange for another Provider to do so on a regular basis during that time. |
| 170 | **Admit.** |
| 171 | **Disputed in part.**<br><br>**Controverting Statement.**<br><br>The fact that Taylor had an "extremely limited" role in reviewing Inmate Informal Complaint Resolutions is irrelevant to the fact that in # 171 she admits to being asked by CIII Carillo to review Bastian's Informal Complaint Resolution ("ICR") and declined to do so. |
| 172 | **Disputed in part.**<br><br>**Controverted Statement.**  There is no record evidence other than Taylor's Declaration (# 18) to support her claim that she was not "allowed to see" Mr. Bastian. |
| 173 | **Disputed.**<br><br>**Controverting Statement.**<br><br>The fact that Taylor had an "extremely limited" role in reviewing Inmate Informal Complaint Resolutions is irrelevant to the fact that in # 171 she admits to being asked by CPIII Carillo to review Bastian's Informal Complaint Resolution ("ICR") and refused to do so. |

| | |
|---|---|
| 174 | **Admit.** |
| 175 | **Dispute.**<br><br>**Controverting Statement.s**<br><br>In # 174, Taylor specifically told COIII Carillo that she was "unable to assist in the matter." She then tries to parse words to claim that she never "refused to respond to COIII Carillo" because she did send an e-mail telling that she "could not assist" him.<br><br>Taylor's  indifference to an ADOC officer's request for assistance to respond to a Mr. Bastian's patient's medical needs ca not be whitewashed with twisted semantics. |
| 176 | **Disputed.**<br><br>**Controverting Statements.**<br><br>The x-rays from October 9, 2014 did not show a normal left shoulder. |
| 177 | **Admit.**<br><br>**Clarification.**<br><br>Upon arrival at Lewis Prison from Eyman, Mr. Bastian had an SNO for front  restraints, which Taylor left in place. |
| 178. | **Dispute.**<br><br>**Controverting Statements.**<br><br>The MRI on April 17, 2015 did not show a "normal" left shoulder. [Corizon_Bates_0018857-59.]  The MRI revealed |
| 179 | **Dispute.**<br><br>**Controverting Statements.**<br><br>In response to the physical exam, Dr. Toth performed an injection intended to provide six weeks of relief until a follow-up consult could be scheduled and the MRI results from April 17, 2015, provided to Dr. Toth.   [Bastian DEP at __;<br><br>Dr. Toth advised Mr. Bastian that surgery might be needed and to follow up with Corizon for another consult. [Bastian Dec at _____. ] |
| 180 | **Admit in part.** |

| | | |
|---|---|---|
| | **Controverting Statements.**<br><br>Wendy Davis is not a Provider or an RN.  She is an   [Exh.___]<br><br>Taylor discontinued the SNO for side restraints without examining her patient or even having him examined by a nurse. | |
| 181 | **Objection.**<br><br>**Inability to recall**<br><br>**Controverting Statements.**.<br><br>Not a single prior imaging study revealed a "normal" left shoulder.  All studies revealed one or more abnormalities. | |
| 182 | **Dispute**.<br><br>**Controverting Statements.**<br><br>Taylor is not an expert in prison security nor does she cite to any record evidence as to why she left Mr. Bastian on an SNO for side restraints at his intake exam and took did not renew it after she had an MRI and a request from Dr. Toth for a follow-up consult that because of the missing MRI.<br><br>It was only after the incident involving the LPN and Taylor stopped seeing Mr. Bastian that she decided not to renew the SNO. | |
| 183 | **Dispute.**<br><br>**Controverting Statements.**<br><br>Taylor did not examine Mr. Bastian on November 15, 2015,  when she discontinued his SNO for side restraints.  She cites only a non-nurse's assessment that no distress was noted. | |
| 184 | **Admit** | |
| 185 | **Dispute**<br><br>**Objection.  Can Not Recall.** | |
| 186 | **Disputed**<br><br>**Controverting Statements.** | |

| | |
|---|---|
| | Taylor admits in # 180 and # 181 that she refused to renew Mr. Batian's SNO on November 19, 2015 without evaluating him and with no justification other than a non-nurse's unspecifed "assessment." While claiming that she "could not" or "was not allowed to" or had "stepped away from" treating Mr. Bastian, she did not hesitate to deprive him of an already prescribed comfort item.<br><br>At the first visit after Taylor began seeing Mr. Bastian on August of 2016, she immediately reinstituted his SNO for side restraints, without any new diagnostic or other clinical evidence other than his complaints about pain. |
| 187 | **Admit** |
| 188 | **Disputed.**<br><br>**Objections.**<br><br>**"has no recollection.**<br><br>**Controverting Statement.**<br><br>Taylor admits that she was unaware that the *Tamsulosin gave Mr. Bastian migraine headaches.* |
| 189 | **Disputed.**<br><br>**Objection.**<br><br>This is self-serving, conclusory statement. |
| 190 | **Admit.** |
| 191 | **Disputed.**<br><br>Controverting Statement.<br><br>The dipstick test was a false positive. The laboratory test was negative. The dipstick test was a false positive. [Exh.   ]. |
| 192 | **Disputed.**<br><br>**Controverting Statements.**<br><br>Taylor is a nurse, not a physician, and cannot offer "medical opinions." Moreover, her conclusions about the "likely" role of Mr. Bastian's alleged use of methamphetamine is irrelevant in a sec. 1983 case in which comparative fault is irrelevant. |

|  |  | |
|---|---|---|
|  | To the extent Taylor tries to excuse her lack of care by "judging" her patient, her approach is contrary to Corizon's policy which is to treat all patients regardless fo their offense<br><br>Methamphetamine is not an opiate. It is a stimulant.  See generally,<br><br>Absent proper qualification as an expert under Fed. R. Evid.702 and 703, Taylor's citation to one nursing journal article and a self-help website are inadmissible under Rules 702 and 703and may not be considered by the Court | |
| 193 | **Admit.** | |
| 194 | **Admit.** | |
| 195 | **Admit.** | |
| 196 | **Admit.** | |
| 197 | **Admit.** | |
| 198 | **Admit.** | |
| 199 | **Admit**<br><br>**Objections.** Relevance ---  Mr. Bastian's complaint it relates to Taylor's failure to see him between November of 2015 and July of 2016, not about the care that she provided when she did fulfill her obligations  as his treating physician. is not that | |
| 200 | **Disputed.**<br><br>**Objection.**   Taylor lacks personal knowledge of the statements in this paragraph as to what happened when COIII Hebert was at Mr. Bastian's cell.<br><br> All of which rest of the "facts" in this paragraph are hearsay statements by COIII CARL Hebert ("COIII Hebert.")<br><br>**Controverting Statements.** In his Declaration, Mr.  Bastian denies any such conversation with COII Herbert and refutes each and every assertion in this paragraph. [Exhibit __] | |
| 201 | **Disputed.**<br><br>**Controverting Statements.** In his Declaration, Mr.  Bastian denies each and every statement which Taylor attributes to him in this paragraph. [Exhibit __]. Mr. Bastian's deposition also refutes each of these statements. [Exh. __] | |
| 202 | **Disputed.**<br><br>**Objection:** Lack of Personal Knowledge; Hearsay. Taylor lacks personal knowledge of the statements in this paragraph, all of which rest on hearsay statements by COIII CARL Hebert ("COIII Hebert."); Misleading use of the term "stalking" to frighten, sensationalize, and mislead -- even suggest a criminal activity  --- by Mr. Bastian. | |

| | |
|---|---|
| | **Controverting Statements.**<br><br>Taylor admitted at her deposition that her Face Book setting were public (PSSOF # _____, Taylor Dep at    ], yet claims her "privacy" was violate/<br><br>Mr. Bastian denies ever accessing Taylor's Facebook page, denies ever seeing Taylor's Facebook page and ever talking to Taylor about her Facebook page during his appointment.<br><br>Taylor never filed an IR or other report about the so-called Facebook Stalking." |
| 203 | **Disputed.**<br><br>**Controverting Statement.**<br><br>Other than Taylor's assertion, there is no record evidence that Taylor and Hebert reached any agreement about who would file an IR. |
| 204 | **Disputed**<br><br>**Controverting Statement.**<br><br>COII Hebert Field an IR but there is no record evidence that this was done by agreement with Taylor. |
| 205 | **Disputed.**<br><br>**Controverting Statements**. Mr. Bastian denies that he was issued a disciplinary report for "possession of a USB cable and 2 flash cards" in his cell on 7-10-15." [Bastian Dec. at 2].<br><br>Mr. Bastian denies that he had been "caught in the past with cell phones" or that he had access to "electronic devices deemed prohibited and deemed contraband." (Bastina Dec at 2]<br><br>There is no record evidence to substantiate either of Taylor's claims.<br><br>There is no record evidence of Taylor's assertion. |
| 206. | **Disputed**.<br><br>**Controverting Statements.**<br><br>Other than Taylor's claims in her Declaration to support her Statement of Facts, there is no record evidence of any "immediate" communication from Taylor to Rojas regarding reassignment of Taylor form seeing Mr. Bastian or having him seen by another provider. |

18

| | | |
|---|---|---|
| | Ms. Rojas denies these conversations took place. | |
| 207 | **Disputed.** | |
| | **Controverting Statements**.  No record evidence exists to support Taylor's conclusory, self-serving contention that FHA Rojas "appeared to appreciate and understand" Taylor's claimed concerns. | |
| | FHA Rojas contradicted Taylor's assertions that she agreed that Taylor did not have to see Mr. Bastian. | |
| | Whether Taylor has a "reasonable belief" is classically a question for the jury and is inappropriate for summary disposition. _____ | |
| 208 | **Disputed .** | |
| | **Objection.** Whether Taylor has a "reasonable belief" as to what FHA Rojas did or with whom she spoke is  a question for the jury and inappropriate for resolution on summary disposition. | |
| | **Controverting Statements**. There was no "Deputy Warden Moody" Lewis Prison or Rast Unit. | |
| | FHA Rojas denies Taylor's claim that Taylor spoke to Rojas of that Rojas spoke with "Deputy Warden Moody." | |
| 209 | **Disputed.** | |
| | **Controverting Statements.** FHA Kateusha Thomas denies that Taylor ever advised her about the Facebook "stalking incident" or expressed concerns about seeing Mr. Bastian [PSSOF    ], or requested that Mr. Bastian be seen by a different medical provider. [PSSOF ]. | |
| | Mr. Bastian was not assigned to another Provider. | |
| 210 | **Disputed.** | |
| | **Objection.** Whether Taylor has a "reasonable belief" as to what FHA Rojas did or with whom she spoke is a question for the jury and inappropriate for resolution on summary disposition. | |
| | **Controverting Statements.** Other than Taylor's assertion, there is no record evidence that FHA Kateusha Thomas expressed "appreciation and understanding" concerns about seeing Mr. Bastian or requested that Mr. Bastian be seen by a different medical provider. | |
| | Mr. Bastian was not assigned to another Provider. | |
| 211 | **Disputed.** | |

| | |
|---|---|
| | **Objection.**<br><br>Hearsay as to What Dr. Malichinski "agreed" or how he "validated" Taylor's concerns.<br><br>**Controverted Statement.**<br>No record evidence exists to support Taylor's claim that she spoke to Dr. Malichinski about her concerns about treating Plaintiff and that he "validated" her concerns. |
| 212 | **Disputed.**<br><br>**Objection.**<br><br>Hearsay as to **w**hat Taylor "understood" from alleged conversations with Dr. Malichinski. Additionally, Taylor's credibility on this issue is a question for the jury that hinges on assessment of Taylor's credibility.<br><br>Other than Taylor's self-serving assertions, no record evidence establishes the conversations that Taylor claims she had with Dr. Malachinski. |
| 213 | **Disputed.**<br><br>**Objection.**<br><br>Hearsay as to conversations that Taylor claims to have had with FHA Rojas, FHA Thomas and Dr. Malichinski.<br><br>**Controverting Statements**.<br>Other than Taylor's self-serving assertions, no record evidence establishes the conversations that Taylor claims she had with occurred Rojas, Thomas, or Malachinski.<br><br>FHAs Rojas and Thomas deny the conversations that Taylor asserts occurred.<br><br>Taylor admits that she decided nto to see Mr. Bastian and that her decision is justified by "common sense." However, Taylor's claim that she "should be able to this and request that another medical provider taker her place" is exactly what did not occur.<br><br>Taylor's claim that "common sense" permits her excuse herself form seeing a given inmate and request another provider to see him is contradicted by FHA Rojas [PSSOF    ] , FHA Thomas [PSSOF    ], and Site Medical Director, Dr. Barnett [PSSOF   ]. |
| 214. | **Disputed Facts.**<br><br>**Objections**.  What Taylor "reasonably believed" is a question for the jury that rests, in part, on an assessment of her credibility. |

| | |
|---|---|
| | **Controverting Facts**. There was an applicable policy in effect at the time, and it was _____. |
| | Taylor admits that she did not follow that policy. |
| | Tsylor admits that she reported to FHA Rojas and FHA Thomas for her assignment of patients, yet neither of them were aware that she was not seeing Mr. Bastian and bother testified that she as his assigned provider. |
| 215. | **Disputed.** |
| | **Objections.**  Rule 56 (c)(4) requires that there be sufficient facts to support these self-serving statements and claims. Whether Taylor had a "reasonable impression" is a jury question regarding credibility and is inappropriate for resolution at summary judgment. |
| | "Malicious intent" is not required to prove deliberate indifference. |
| | **Controverting Statements.**  No record evidence demonstrates that Taylor was relived of seeing Mr. Bastian.  No record evidence exists that anyone informed Taylor her patient's care had been transferred to another Provider.   The fact that Taylor did not know about the delays in her assigned patient's care is an admission that she was not seeing him, was not reviewing his medical record … despite **not** having properly assured that he was being seen by another Provider.  Taylor tries to negate the word "refused" by claiming, once again, that she was under a reasonable impression that Mr. Bastian was being seen by another provider. No record evidence support this conclusion and assertion. |
| | Corizon's policy existed at all times relevant to Mr. Bastion's Complaint.  If Taylor felt uneasy seeing any inmate, she could have additional security present. |
| 216 | **Disputed.** |
| | **Controverting Statements** |
| | Taylor admits in # 157 that her duties include "scheduling sick call appointments" yet claims here that she had "no involvement in the scheduling of inmates for medical appointments." |
| | Taylor fails to explain how she would have been "advised of Plaintiff's appointments" if he had none because all of his HNRs and requests to see her were being ignored. |
| 217 | **Disputed.** |

**Objections.** Taylor's claim that it was clear "from her perspective" is question of credibility that is inappropriate for resolution at summary judgment.

**Controverting Statements.** Taylor's claims that she advised ADC correctional staff that she was no longer seeing Mr. Bastian is not supported by any other record evidence either written or in the form of deposition of declaration testimony.  And it is contradicted by the every other Corizon employee who has testified.  [PSSSOF                    ].

Corizon staff testified at their depositions that Taylor should have arranged for her patient to be seen by someone else and that she could not merely stop seeing a patient

| 218 | **Disputed.** |
| --- | --- |
|  | **Controverting Statement.** |
|  | The fact that Ende saw Mr. Bastian on a few occasions does not relate to Taylor's liability for failing to see her patient or arrange for him to be seen on a regular basis. |
|  | The fact that Mr. Bastian was seen on the nursing line does not replace the care he missed from not seeing his a Provider, which Taylor explains at # 157 of her Declaration is a "higher level" than nursing care. |
|  | ] |
| 219 | **Disputed.** |
|  | **Objections. Does not recall** |
|  | **Controverting Statements.**  Taylor remained Mr. Bastian's assigned provider, received lab findings and occasionally tests and consultations for him – all without ever seeing him, examining him, or (supposedly) reviewing any HNRS or other information he submitted regarding his signs, symptoms, and needs.  All the while she dud nto see her patient but admits she treated him (almost inadvertently) in a vacuum. |
| 220 | **Disputed.** |
|  | **Controverting Statements.  .** Taylor began seeing Mr. Bastian on August 15, 2016, for left shoulder pain.  This was *after* he filed his Complaint [Doc. 1], after the Director had inquired as to why he was not being seen, and after Taylor was talked to by                    . (PSSOF   ). Despite no new information as to his allegedly "normal' shoulder" (_____ above _____,) Taylor ordered offsite consultations, two pain medications, and an SNO for a shower chair. |

| | Mr. Bastian testified that Taylor gave him everything he asked for. | |
|---|---|---|
| 221 | **Disputed.**<br><br>**Objection.** These events are beyond the times at issue in Mr. Bastian's Complaint.<br><br>**Controverting Statements**. Nonetheles, Taylor's statements  establish the need for more catheter supplies than Mr.  Bastian had ever been prescribed in the prior seven months (# 68), offsite urology consultations (# 223), additional imaging studies related to urinary dysfunction, and an MRI to rule out spinal cord syndrome as a cause of his urinary problems ---- which confirmed the presence of the SLAP tear (Oct. 4, 2016) in Mr. Bastian's left shoulder (#225). | |
| 222-226 | **Admitted.**<br><br>**Objections.** Relevance.<br><br>**Controverting Statements**.  Each of these paragraphs relate to events after the period of time at issue in Mr. Bastian's Complaint. | |
| 227 | **Admit.**<br><br>**Objection**. The nature of Mr. Bastian's charges are irrelevant but, once again, reflect Taylor's proclivity to "judge " inmate patients based on the nature of their crime of conviction or new charges for which, of course,  they are presumed innocent. | |
| 228 | **Admit.** | |
| 229 | **Admit.**<br><br>**Clarification.**  These facts established that from the first day Taylor saw Mr. Bastia  his intake exam at Lewis,  she as aware of a "possible SALP tear" that existed since December of 2014. | |
| 230 | **Admit.** | |
| 231 | **Admit.**<br><br>**Clarification.** Despite claiming in # 232 that the MRI was "normal," Taylor nonetheless referred Mr.  Bastian for an offsite consult with orthopedic surgeon,  Dr. Toth. | |
| 232, 233, 234, 235 | **Disputed.**<br><br>**Controverting Statements.** The phrase "normal left shoulder" does not appear in any of the cited reports.   Moreover, Dr. Toth performed an injection intended to relieve pain for up to six weeks, pending receipt of the missing MRI images and report from April of 2015, and return for a complete consultation with benefit of the MRI images and report.  Because Taylor stopped seeing Mr. Bastian in November of 2015, all of his follow-up care with Dr. Toth fell through the cracks.  It was only in October of 2016 as set forth in # 236 --- that Mr. Bastian finally had the needed follow-up with Dr. Toth from August of 2015.   And Dr. Toth diagnosed M., Bastian with "positive SALP testing."    He recommended anMRA. | |

| 236 | Admit. |
| | |
| | **Clarification.**  These statements establish that the SLAP tear occurred sometime between April of 2015 and October of 2016 – almost the exact time that Mr. Bastian was without follow-up care by Taylor. |
| 237 | **Objections**. Relevance; These events are outside the timeframe at tissue in Plaintiff's Complaint. |
| | |
| | **Controverting Statements**. Mr. Bastian]s Declaration clarifies his belief that he finally got his shoulder repaired because he  was transferred to MCSO custody in November of 2016. By April of 2017, his shoulder pain had been fully worked up and he then had the necessary repair surgery. |
| 238 | **Admit.** |
| | |
| | **Controverting Statements**. Taylor focuses on the presence of a "SLAP" tear in the shoulder,  which is only one of a range of shoulder injuries**.**  Remarkably, she nonetheless claims that Mr. Bastian was never diagnosed with a "SLAP" tear, while admitting that his follow-up with Dr. Toth was suspended form August of 2015 until October of 2016 because he had no assigned Provider seeing him and scheduling follow-up offsite consults. |
| 239-242 | **Admit** |
| | |
| | **Clarification.**  Taylor finally comes to terms with the fact that once in MCSO, Mr, Bastian had the long overdue work-up for his shoulder pain and successful surgery was performed. But for Taylor abandoning Mr. Bastian in September of 2015, that surgery would have occurred in the fall of 2015 and Mr. BAStian would have been spared a full year of pain and misery. |
| 243 | **Disputed.** |
| | |
| | **Objections.** Taylor is a treating physician, not a disclosed expert, and may not testify as a causation expert, including as to the time of onset of a SLAP tear. |
| | |
| | **Controverting Statements**.  The term "vastly normal" is unclear and misleading. Presumably Taylor is saying there were no abnormalities, which is belied by the fact that every shoulder study had some abnormalities.  None were "normal." |
| | |
| | **Controverting statements. M**r. Bastian had a suspected SLAP tear in 2014 in Browning prior to transfer to Lewis (#    ).  Dr. Toth's report in October of 2016 was the first time that Mr. Bastian was seen **after** Taylor stopped seeing him.   Thus, Taylor never followed up to assure that Dr. Toth got the MRI report form April of 2015 and completed his consultation begin on _____.  But for Taylor ignoring her patient, there was no reason for delay in diagnosis of the possible SLAP tear until October of 2016. |
| 244 | **Disputed.** |

| | |
|---|---|
| | **Objection**.  Speculative; no evidence exists in the record as to the standard of care for a suspected SLAP tear, was nor is it relevant in a sec. 1983 action. |
| 245 | **Admit.**<br><br>**Clarification.**   The events in 2017 are outside the time frame at issue in Mr. Bastian's complaint.  The care at MCSO has nothing to do with the pain and suffering he endured when he was not able to catheterize due to lack of catheter supplies or otherwise get help for inability to urinate during the time that Taylor did not see him. |
| 246, 247 | **Disputed.**<br><br>**Objections.** Taylor is not an expert witness nor is she qualified to serve as a medical expert on the issue of the sequalae of complications from enlarged prostate and urinary retention.<br><br>**Controverting Statements**. Taylor's statements overlook the crux of Mr. Bastian's claimed injuries.  He does not claim that the care he did receive for his prostate and and urinary problems harmed him.  His claimed injuries are terrible pain and unnecessary, significant emotional and physical suffering when his care was delayed and/or non-existent when Taylor stopped seeing him.  [See DOC 1, Complaint at 31]. |
| 248 | **Disputed.**<br><br>**Objections**. Taylor's statement is conclusory and self-serving statements lacking facts that are admissible into evidence.  It is a synopsis of the very questions properly presented to a jury  in this matter . |

## II.    PLAINTIFF'S' LOCAL RULE 56.1(b)(2) SEPARATE STATEMENT OF ADDITIONAL FACTS THAT EITHER ESTABLISH A GENUINE ISSUE OF MATERIAL FACT OR OTHEWISE PRECLUDE JUDGMENTIN FAVOR OF DEFENDANT AND THAT ARE CITED WITHIN PLAINTIFF'S RESPONSIVE MEMORANDUM SUBMITTED IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ("SSOF").

1. Defendant Taylor was the primary care provider at Lewis Prison, Rast Unit, at all times at issue in Mr. Bastian's Complaint. (Exh. 1, Bastian Dep. at 16:19-20; 129:17-20; Exh. 1, Barnett Dep. at 35:15-15)

2. Taylor was the only provider assigned to Rast Max.  (Exh. 2, Taylor Dep. at 50:21-22.)

3. Taylor was Mr. Bastian's "primary care provider" but "refused" to see Bastian despite his submitting "many, many HNRS."  (Exh. 1, Bastian Dep. at 27:2-5).

4. Mr. Bastian's shoulder injury makes it painful for him to be cuffed behind the back because it pulls his shoulder back.  (Exh. 1, Bastian Dep. at 18:20-23.)

5. Mr. Bastian was issued a SNO [Special Nursing Order] for side restraints before arriving at Lewis Prison. (Exh. 1, Bastian Dep. at 21:5-6.)

6. Without seeing Mr. Bastian, Taylor did not renew his SNO for side restraints. (Exh. 1, Bastian Dep. 22:14-17; 23:9-10.)

7. Once Bastian filed his lawsuit, and attended a meeting with Dr. Barnett and Thomas, Taylor saw him for the first time in nine months and "gave [him] everything" he wanted, including a new SNO for side restraints and new medication (Exh. 1, Bastian Dep. at 23:9-18), ordered his consult, gave him new shows, wrote a new side restraint waiver, gave him catheters, and asked if he needed other SNOs. (Exh. 1 Bastian Dep. at 112:17-22.)

8. Mr. Bastian's complaint against Taylor is that she failed to prove him needed medical care and discontinued his medical care in retaliation for an incident that happened involving prior staff. (Exh. __, Bastian Dep. at 16:19-24.)

9. Mr. Batian's wife e-mailed Warden Moody abut Mr. Bastian not being seen and  (Exh. 1, Bastian Dep. at ___.

10. Mr. Bastian received one injection from Dr. Toth, not a series of injections. (Exh. 1, Bastian Dep. at 50:8-9).

11. Dr. Ibrahim diagnosed Mr. Bastian's enlarged prostate and prescribed medication. (Exh. 1, Bastian Dep. at 51:12-24).

12. On one occasion, when Mr. Bastian was out of catheters and had to wait "all day" to go to medical to be catheterized he reported to staff that he felt like his "bladder was going to break."  (Exh. 1, Bastian Dep. at 68:9-17.)

13. Mr. Bastian explained the supposed Facebook incident in specific detail:

   a. There had been an "allegation" that Mr. Bastian  had a cell phone. (Exh. 1, Bastian Dep. at 71:21-22.
   b. When the Officer came to Mr. Bastian's cell to cuff him up to go to the nurse's line, they began "joking around" (Exh. 1 Bastian Dep. at 72:2).
   c. The Officer hoped he didn't interrupt Bastian up on his bunk "on the phone" or "on Facebook"  (Exh.1, Bastian Dep. at 72:4-5.)
   d. Bastian said, "yeah, that's what do. I sit in the cell on Facebook all day." (Exh. `, Bastian Dep. at 72:6-8.)
   e. After arriving in medical, the Officer and Bastian were still laughing and Taylor asked "What did I miss?" The Officer jokingly told Taylor that Bastian was in his cell "checking out your Facebook page."  (Exh. 1, Bastian Dep. at 72:11-12.

14. Mr. Bastian denies that he ever told Taylor that he "was watching her on Facebook or seen her [on Facebook]."   (Exh. 1, Bastian Dep. At 72:14-15; Bastian Declaration at 1.)

15. Mr. Bastian never saw Taylor's Facebook page. (Bastian Dec. at 2.)

16. Mr. Bastian never got information from anyone as to "what's on Taylor's Facebook page." (Exh. 1, Dep at 128:5-7.)

17. Mr. Bastian submitted multiple HNRS to be seen by Taylor and was charged four dollars for visits that never occurred. (Exh. 2, Bastian Dep. at 72: 24- 73:1; 73:6-10.)

18. Mr. Bastian wrote to the FHA and she refunded his money. (Exh.1, Bastian Dep. at 73:16-22.)

19. His CO-3's informal response noted that he had emailed and called Taylor and she would not respond regarding Bastian's medical. (Exh. 1, Bastian Dep. 74 at 7-11).

20. In August of 2016, Taylor saw Mr. Bastian and apologized for "not seeing him." (Exh. 1, Bastian Dep. at 111: 13-14.)  Taylor explained that she was under the impression that he had seen her Facebook Page but 'didn't know." (Exh. 1, Bastian Dep. at 111: 13-19).

21. Mr. Bastian never used a cell phone to access Facebook. (Exh. 1, Bastian Dep. at 128:2-4; Bastian Dec at 6.).

22. Mr. Bastian was never questioned by any correctional officer about seeing Taylor's children and dogs on her Facebook Page. (Exh. 1, Bastian Dep. at 9-18.)

23. Mr. Bastian never saw the IR relating to Taylor's Facebook page until he filed his lawsuit and it was produced in discovery. (Bastian Dec. at 3.)

24. Mr. Bastian never received a disciplinary report for anything to do with Taylor or her Facebook or any conversation with her. (Bastian Dec.  4.)

25. Mr. Bastian never received a disciplinary write-up for cellphones, a USB cable and Flashcards.  (Bastian Dec. at 5.)

26. After his shoulder repair while in custody at MCSO, Mr. Bastian has good range of motion and less pain. (Exh. 1, Bastian Depo at 128:19-25.)

28

27. Mr. Bastian could not think of any way that Taylor would not know that he had bladder problems, used catheters, had problems urinating, and had pain from his urological problems. (Exh. 1, Bastian Dep. at 129:21-130:13.)

28. The main reason Mr. Bastian filed his lawsuit was to try to get his shoulder fixed, not to get access to drugs. (Exh. 1, Bastian Dep. 130 at:14-15).

29. Taylor knew LPN Smith and was aware of the reason she left Corizon. (Exh.2, Taylor Dep. at 9:1-5).

30. Taylor explained that LPN Smith "F _ _ _ ked up" when she handed a porter medication for an inmate and was turned in." (Exh 2. Taylor Dep. at 9:12-20.)

31. Taylor learned that Mr. Bastian was the inmate whose medicine was given to the Porter. (Exh. 2, Taylor Dep. at 8:22-9:1).

32. LPN Smith was fired. (Exh. 2, Taylor Dep. at 11).

33. Mr. Bastian observed Nurse Smith divert his medication to other inmates. (Exh. 1, Bastian Dep. at 57:16). This happened six-to eight times. (Exh. 1, Bastian Dep. at 57:20.)

34. Mr. Bastian was the inmate who complained to DOC about LPN Smith and cooperated in the investigation that led to DOC reporting LPN Smith to Corizon. (Bastian Dec. at 6).

35. At Rast Max, there is always a security officer present in room when a provider sees an inmate. (Exh. 2, Taylor Dep. at 913:12-20.)

36. Taylor could have asked for more than one officer to be present. (Exh. 2, Taylor Dep. at 13:4-6.)

37. Taylor explained that an HNR is a document that an inmate uses in "asking for an appointment or something." (Exh. 2. Taylor Dep. at 15:22-24.)

38. Inmates fill our HNRs to ask for an appointment with their provider. (Exh. 2, Taylor Dep. at 16:6-8.)

39. There is no way other than an HNR that an inmate can ask to be seen other than by filling out an HNR. (Exh. 2, Taylor Dep. at 16:23-24.)

40. Taylor generally would expect an inmate to be seen the same day or the day after the inmate submits an HNR. (Exh. 2, Taylor Dep. at 9:3-10.)

41. When Taylor first went to work at Rast, Brenda Rojas ("Ms. Rojas") was the Health Facility Administrator ("HFA") and Ms. Thomas was the Assistant Health Facility Administrator "(AFHA"). (Exh. 2, Taylor Dep. at 26:22-27:5.)

42. Taylor testified that she does not see the HNR at the time she sees an inmate. (Exh. 2, Taylor Dep. at 44:7-8.)

43. Mr. Bastian cannot recall any time in the past few years, long before his arrival at Lewis, \that the provider did to have his HNR available on the computer.  Taylor was well-organized at visits and would start out the visit asking him about information that he put in his HNR as to why he needed to be seen. He specifically recalls seeing her click on her computer and read almost verbatim what he had written.

44. Because Taylor was the only provider at Rast, when she was on vacation, another provider from one of the other units would cover Rast. (Exh 2, Taylor Dep. at 44:18-23.)

45. Taylor stopped seeing Mr. Bastian for about seven months (Exh. 2, Taylor Dep. at 47:17-19) because she "did not feel comfortable seeing him."  (Exh. 2, Taylor Dep. at 47:1-5.)

46. Taylor told people, "I can't see him." (Exh. 2, Taylor Dep. at 47:6-8.)

47. Taylor could have seen Mr. Bastian, but would not. (Exh. 2. Taylor Dep. at 47:13-16.)

48. Taylor testified that when she told Ms. Rojas, the HFA, that she was uncomfortable seeing Mr. Bastian, Ms. Rojas agreed that Taylor would not see him. (Exh. 2, Taylor Dep. at 48:11-14.)

49. Taylor does not know why she did not go to the site medical director, Dr. Malikinski instead of Ms. Rojas. (Exh. 2, Taylor Dep. at 49:16-19.)

50. Ms. Taylor testified that Ms. Rojas was authorized to approve her not seeing Mr. Bastian. (Exh. 2, Taylor Dep. at 49:21-50:1.)

51. Taylor did not refer Mr. Bastian to someone else but "discussed with Rojas that the site medical director would either see him or have someone else see him." (Exh. 2, Taylor Dep. at 50:9-13.)

52. The only thing Taylor did to get Mr. Bastian assigned to another provider was tell "the facility health administrator about the issue, as she is in charge of all medical and also works with DOC.  I told her the issue." (Exh. 2, Taylor Dep. at 51:17-20.)

53. There is a place in the medical record where Taylor could write that she can't see Mr. Bastian anymore but she did not do that. (Exh. 2, Taylor Dep. at 53:17-19.)

54. During the seven months that Taylor did not see Mr. Bastian, she thought the yard nurse was seeing him. (Exh. 2, Taylor Dep. at 55:14-19), but the yard nurse was not a provider. (Exh. 2, Taylor Dep. at 55:20-21.)

55. Taylor thought that provider Ende was seeing Mr. Bastian but did not know when he first saw him, or how many times. Or if he ever had a scheduled appointment with him. (Exh. 2, Taylor Dep. at 56:2-10).

56. Taylor did not recall if Dr. Malichinski agreed that she Taylor did not have to see Mr. Bastian. (Exh. 2, Taylor Dep. at 58:11-13.)

57. Taylor testified that Mr. Bastian commented to her: "seen your facebook page; nice family." (Exh. 2, Taylor Dep. at 59:5-6) or something in regards to "Nice Facebook page; seen your family." (Exh. 2, Taylor Dep. at 56:22-23).

58. Taylor felt Mr. Bastian "crossed the line when he brought in my family." (Exh. 2, Taylor Dep. at 60:11-12).

59. Taylor did not ask Mr. Bastian how he saw her facebook page or who showed it to him. (Exh. 2, Taylor Dep. at 60:13-18).

60. After Mr. Bastian's appointment, Officer Herbert, who was Taylor's Medical Officer told Taylor that when he got Mr. Bastian from his cell, Mr. Bastian had commented that he and Taylor "go way back. We're friends on Facebook page." (Exh. 2, Taylor Dep. at 61:5-14).

61. Mr. Bastian did not tell Taylor that he went on a computer and accessed her Facebook page. (Exh. 2, Taylor Dep. at 62:19-21).

62. Mr. Bastian did not mention which of her family members or how many he saw; he just mentioned Facebook and her family. (Exh. 2, Taylor Dep. at 64:1-6).

63. Taylor did not file an IR or talk to the Warden about the incident with Mr. Bastian. (Exh. 2, Taylor Dep. at 64:16-21).

64. Officer Herbert filed an IR. (Exh. 2, Taylor Dep. at 65:20-21). ADD here.

65. Ms. Rojas never told Taylor that she told Lewis Warden Chris Moody that someone else would be seeing Mr. Bastian. (Exh. 2, Taylor Dep. at 69:13-22).

66. Taylor does not know if Ms. Rojas ever told the Warden. (Exh. 2, Taylor Dep. at 69: 16-17; 70:12-14).

67. The only person who would know if Ms. Rojas talked to the Warden would be Ms. Rojas or the Warden. (Exh. 2, Taylor Dep. at 69:19-20).

68. Taylor never had any conversation with Warden Moody about the Facebook incident. (Exh. 2, Taylor Dep. at 56:2-10).

69. Taylor does not know if Ms. Rojas talked to Dr. Malichinski and never saw any e-mails between Ms. Rojas and Dr. Malachinski. (Exh. 2, Taylor Dep. at 70:15-22).

70. The medical director is able to change assignment of patients. (Exh. , Taylor Dep. at 69:18-22.

71. When Taylor made the decision not to see Mr. Bastian again, she did not write an e-mail to document it. and never saw any e-mails between Ms. Rojas and Warden Moody. (Exh. 2, Taylor Dep. at 72:17-23.)

72. Taylor expected first Rojas and, then, Thomas to make arrangements for another provider to see Mr. Bastian. (Exh. 2, Taylor Dep. at 78:1-4).

73. Taylor knew it was not appropriate for Mr. Bastian to not have a provider who would see him. (Exh. 2, Taylor Dep. at 113:15-17.)

## BRENDA ROJAS DEPOSITION

74. Ms. Rojas was the Health Facility Administrator ("HFA") at Lewis Prison (Exh. 3, Rojas Dep.).

75. Ms. Rojas …

    a.  Never told Taylor that she was not required to see Mr. Bastian.  (Exh. 3, Rojas Dep, at 14:11-12);

    b.  Never went to the Warden to get his permission for Taylor not to see Mr. Bastian (Exh. 3, Rojas Dep. at 14:14-15; 25:7-10.)

    c.  Does not recall Taylor ever stating that she did not want to see Mr. Bastian as a patient. (Exh. 3, Rojas Dep. at 22:1-3; 25:3-6)

76. Mr. Bastian was never rude to Ms. Rojas, never used profanity to her, and she did not have complaints about him from staff other than Taylor. (Exh. 3, Rojas Dep. at 14:20-15:3.)

77. Corizon' policy required that inmates be seen if they had a reason to be seen. (Exh. 3, Rojas Dep. at 15:14-17)

78. Corizon's policy did not permit a provider not to see an inmate because the inmate was rude. (Exh. 3, Rojas Dep. at 15:18-21.)

79. Ms. Rojas was not aware of any Corizon policy that permitted a provider not to see an inmate because the inmate stalked the provider on Facebook. (Exh. 3, Rojas Dep. at 16:3-5.)

80. Ms. Rojas would have been aware of such a Corizon policy if one existed. (Exh. 3, Rojas Dep. at 16:3-5.)

81. If a provider was not going to see an inmate for for a period of time, the procedure was for the medical director to assign a different provider to go to that particular unit to see the patient or the medical director would see the patient. (Exh. 3, Rojas Dep. at 16:18-24).

82. If a provider did not want to see an inmate, the provider had to go to the medical director. "That's their chain of command." (Exh. 3, Rojas Dep. at 20:14-19).

83. Ms. Rojas does not recall Taylor telling Ms. Rojas that she did not want to see Mr. Bastian. (Exh. 3, Rojas Dep. at 22:1-2)

84. If Taylor had told Ms. Rojas that Taylor did not want to see Mr. Bastian, Ms. Rojas would have referred Taylor to the Medical Director and would not have given her permission not to see Mr. Bastian. (Exh. 3, Rojas Dep. at 22:4-10.)

85. All inmates are seen, regardless of the reason they are in prison or any pending charges. (Exh. 3, Rojas Depo. at 25:20-23.)

## KATAUSHIA THOMAS DEPOSITION

86. Kataushia Thomas was the Health Facility Administrator ("HFA") at Lewis until March 20, 2017. (Exh. 4, Thomas Dep)

87. Corizon's policy is that "we don't refuse to see inmates." (Exh. 4, Thomas Dep. at 31:12-20.)

88. "The policy says that we see inmates." (Exh. 4, Thomas Dep. at 31:7.)

89. "A provider can redirect an inmate to be seen by another provider, but they would have to speak about it." (Exh. 4, Thomas Dep. at 61:10-11.)

90. The provider would "have to have a conversation" with the medical director or a peer. "[W]e would speak about the care, what they've done with that individual and what they're asking for." (Exh. 4, Thomas Dep. at 31:13-20.)

91. The purpose of this policy is to assure continuity of care even beyond what's provided by having an electronic medical record (EMR). (Exh. 4, Thomas Dep. at 32:18-23.)

92. "No one can give permission for a provider not to see an inmate.  They can refer to another provider but no one says, Well, you don't; have to see this person." (Exh. 4, Thomas Dep. at 32:7-9.)

93. If Taylor referred Mr. Bastian to another provider, it would be by an email. (Exh. 4, Thomas Dep. at 41:18-25.)

94. Ms. Thomas did not know how long Mr. Bastian went without being seen. (Exh. 4, Thomas Dep. at 31:12-14.)

95. Ms. Thomas could not think of any reason that it would take Taylor more than two weeks to refer Mr. Bastian to another provider. (Exh. 4, Thomas Dep. at 44:21-24.)

96. An inmate accessing a provider's Facebook would not be a reason that Corizon or anybody would deny him care. (Exh. 4, Thomas Dep. at 47:13-23.)

97. Ms. Thomas took steps to se that Mr. Bastian was being seen by speaking to Taylor, and then going directly to going to Dr. Barnett and asking that "the inmate be seen." (Exh. 4, Thomas Dep. at 49:3-15.)

98. During the time that Mr. Bastian was not seen by Taylor, she remained "absolutely" responsible for monitoring his medication and making sure that he was getting his follow-up appointments. (Exh. 4, Thomas Dep. at 50:10-19.)

99. Taylor remains "absolutely" responsible until she "makes the referral" and the "referral is accomplished."   (Exh. 4, Thomas Dep. at 50:20-23.)

100.     As to Taylor's claim that she was "not allowed to see [Ms. Bastian] due to a conflict" (Corizon_Bates # 1967), Ms. Thomas "does not know" who could have determined that. (Exh. 4, Thomas Dep. at 60:14-19.)

101.     Ms. Thomas was not aware of any process under which anybody within Corizon can say that Taylor is not allowed to see a particular inmate. (Exh. 4, Thomas Dep. at 60:20-23; 70:14-17).

102.     Ms. Thomas assumes the "informal" from Mr. Bastian (Corizon _ Bates # 1967) was sent to Taylor because she was asked by e-mail to give a verbal response (Exh. 4, Thomas Dep. at 61:21-23.)

103.     Taylor was asked for "a verbal response" to Mr. Bastian's Informal (Exh. 4, Thomas Dep. at 61:12-20) but was not willing to give verbal response other than to say that she was not allowed to see him due to conflict. (Exh. 4, Thomas Dep. at 62:12-15; 62:12-15.)

104.     Ms. Thomas "can not imagine why" this was Taylor's response. (Exh. 4, Rojas Dep. at 62:16-17.)

105.     Taylor never told Ms. Thomas that Mr. Bastian "stalked" Taylor on social media. (Exh. 4, Rojas Dep. at 63:19-21.)

106.     On July 13, 2016, Lewis Medical Director Dr. Barnett asked Taylor "what is the reason you cannot see him?" (Exh. 4, Thomas Dep. at 62:20-63; CORIZON _ Bates # 1959, E-mail dated July 13, 2016 at 5:33PM from Dr. Barnett to Tammy Taylor).

107.     Taylor's response to Dr. Barnett was that she spoke to Ms. Thomas. Exh. 4, Thomas Dep. at 62: (Corizon _ Bates # 1959).

108.     Ms. Thomas, who was still the Medical Director at Rast on July 13, 2015, has no idea why she was *not* copied on the e-mail in which Taylor claimed to Dr. Barnett to have spoken to Ms. Thomas about not seeing Bastian as Ms. Thomas. (Exh. 4, Rojas Dep. at 64:12-20.)

109.     Based on the medical records,   until July 13, 2016, Ms. Thomas believed that Taylor was Mr. Bastian's provider. (Exh. 4, Thomas Dep. at 68:14-19).

110.     Based on the e-mails from the Contract Monitoring Bureau, Ms. Thomas concludes that Taylor did not see Mr. Bastian  from January of 2015 until July of 2016. (Exh. 4, Thomas Dep. at 69:6-10.)

111.     On July 6, 2016 at 5:04PM, Ms. Thomas asks Taylor to "see Mr. Bastian tomorrow regarding urinary retention and residual?" (Exh. 4, Thomas Dep. at 69:13-19.)

112.     Taylor stated that she "can't see him due to IRs regarding him stalking my social media page and making inappropriate comments." (Exh. 4, Thomas Dep. at 69:16-19.)

113.     Ms. Thoms is not aware of anyone who could tell Taylor that she doesn't have to see Mr. Bastian. (Exh. 4, Taylor Dep. at 70:14-17.)

114.     Ms. Thomas escalated Taylor's not seeing Mr. Bastian to Dr. Barnett, Taylor's "superior," to determine how Dr. Barnett would like to proceed, and advised Dr. Barnett that Ms. Thomas "was not sure why" Taylor cannot see Mr. Bastian. (Exh. 4, Rojas Dep. at 71:114-72:1.)

115.     On July 13, 2016, Taylor claimed in her e-mails to Dr. Barnett and Ms. Thomas that Mr. Bastian was to be seen by provider Ende the following week. However, Ms. Thomas noted: "We don't know if it happened. She just said he was scheduled to see Ende." (Exh. 4, Thomas Dep. at 73:9-12.)

116.     On August 15, 2016, Taylor changed her mind and agrees to see Mr. Bastian "this week." (Exh. 4, Thomas Dep. at 74:2-7.)

117.     In January and February of 2016, there was an informal medical that went to Taylor from the director of nursing to make sure that Bastian was seen for shoulder and bladder pain. (Exh. 4, Thomas Dep. at 82:13-18).

118.     Ms. Thomas first became aware on July 13, 2016 that Taylor had not been seeing Mr. Bastian. (Exh. 4, Thomas Dep. at 82:19-25.)

## DR. BARNETT'S DEPOSITION

119.     Dr. Barnett believes that Ms. Taylor had a cell phone that could access Facebook.  (Exh. 5, Barnett Dep. at 49:3-5).

120.     Dr. Barnett "could not get a direct answer" from Taylor as to who Taylor told about not wanting to see Mr. Bastian. (Exh. 5, Barnett Dep. at 49:15-16.)

121.     When Dr. Barnett looked into who saw Mr. Bastian, she found: "There was a long period of time when he had not been seen by a provider, but had been seen on the nurse's line." (Exh. 5, Barnett Dep. at 56:3-7.)

122.     Dr. Barnett was not aware of any "formal set up" where Taylor could not see Mr. Bastian.  (Exh. 5, Barnett Dep. at 76:2-4.)

123.     Dr. Barnett "does not recall" a conversation with the Warden at Lewis about Mr. Bastian and his health care (Exh. 5, Barnett Dep. at 79:11-13) or about Tammy Taylor's refusal to see Mr. Bastian (Exh 5, Barnett Dep. at 78:18-79:13)

124.     Dr. Barnett never saw an IR completed by anybody regarding Mr. Bastian stalking Ms. Taylor on social meda. (Exh. 5, Barnett Dep. at 80:3-7.)

125.     Ms. Thomas asked that Mr. Bastian be seen after she got an e-mail from Richard Pratt. (Exh. 5, Barnett Dep. at 82:9-18.)

126.     Dr. Barnett agreed that an e-mail from Richard Pratt is "a pretty big prompt."   (Exh. 5, Barnett Dep. at 82:20-21) that "heightens everyone's awareness of the issue." (Exh. 5, Barnett Dep. at 82:22-83:9.)

127.     The e-mail from Richard Pratt referred to Mr. Bastian's matter as a "Director's Project."   (Exh. 5, Barnett Dep. at 83:18-21.)

**128.** Dr. Barnett's e-mails capture the important points about the expectations for Taylor to see Mr. Bastian. (Exh. 5, Barnett Dep. at 92:13-16.)

Respectfully Submitted this 8th day of March 2018.

/s/ Holly R. Gieszl
Holly R. Gieszl
THE GIESZL FIRM
Counsel for PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

J. Scott Conlon
Renaud Cook Drury Mesaros, PA
One Norht Central, Suite 900
Phoenix, AZ 85004-4417

Sarah Schaade
Renaud Cook Drury Mesaros, PA
One Norht Central, Suite 900
Phoenix, AZ 85004-4417

By: HRG